STROUD, Judge.
 

 Defendant Monica Georgett Lueallen ("Mother") appeals from the trial court's order on permanent child support, modification of child support, child custody, attorney fees and contempt entered on 5 December 2014. On appeal, Mother raises numerous arguments regarding multiple aspects of the order. We affirm the order's provisions addressing child custody, with the exception of Decrees 4 and 6, and we must vacate and remand portions of the remainder of the order for recalculation of child support and arrears, establishment of definite purge conditions,
 additional findings of fact regarding Mother's ability to comply with purge conditions, and additional findings of fact regarding the award of attorney fees.
 

 I. Factual and Procedural Background
 

 Plaintiff Mike Dewayne Lueallen ("Father") and defendant Monica Georgett Lueallen ("Mother") were married in 2001 and one child, Timothy
 
 [1]
 
 , was born to the marriage. When Timothy was born in 2006, the parties lived in Arkansas, but they moved to North Carolina about six months after his birth, so Timothy spent most of his life in the Union County/Charlotte area. In November of 2011
 
 [2]
 
 , the parties separated and Timothy began to reside primarily with Mother. Both parties had Masters degrees in education and at the time of their separation, both were employed by the Union County Schools.
 

 On 24 May 2012, effective 21 June 2012, Mother resigned from her job in Union County, although she did not yet have another job lined up. She received a job offer from a school in Arkansas on 15 July 2012 and went to Arkansas, taking Timothy with her. In early July, Mother initially told Father that she would be taking Timothy for a "family trip" to Arkansas and that they would
 return in about a week to 10 days, in time for a camping trip he had planned with Timothy to begin around 20 or 21 July 2012. Father, however, was unable to reach Mother during her Arkansas trip with Timothy, and they had not returned by 21 July 2012. On 21 July 2012, Mother informed Father that there was a job available for her in Arkansas, that she had an apartment, and that " 'our things are in storage.' " He then attempted but was unable to make contact with her or Timothy for about a week. On 25 July 2012, Father filed a complaint in Union County seeking emergency ex parte child custody, child custody, child support, and attorney fees. On the same day, the trial court entered an ex parte custody order granting Father temporary sole custody of Timothy pending further order and requiring Mother to return Timothy to Union County.
 Father notified Mother that he was coming to Arkansas to get Timothy and arrived on 27 or 28 July 2012. Initially, Arkansas authorities refused to assist him in getting Timothy. He registered the North Carolina ex parte custody order in Cross County, Arkansas, on 30 July 2012, and the order was served on Mother the same day, although it was not filed until 16 October 2012. Mother also filed for and received an "Ex Parte Order of Protection" in Cross County, Arkansas, on the same day. Her domestic violence complaint in Arkansas "described an incident that occurred in October of 2011 in North Carolina" when the "parties [had] decided to separate, with [Father] leaving the home." The Arkansas Court vacated the portions of the Arkansas ex parte order dealing with child custody based upon the previously-issued North Carolina ex parte order, which granted custody of Timothy to Father. Mother later dismissed the Arkansas domestic violence action against Father. Father returned to North Carolina with Timothy.
 

 On or about 3 January 2013, Mother filed her answer and counterclaims for divorce, child custody, child support, post-separation support, equitable distribution, alimony, and attorney fees. On 16 January 2013, the trial court held a hearing on the return of the ex parte custody order. As a result of this hearing, the trial court entered a visitation order on 18 January 2013, pending a hearing on temporary child custody. This order kept the ex parte custody order in effect, scheduled a hearing on temporary custody and support for 11 March 2013, and granted Mother visitation with Timothy in North Carolina every other weekend from 6:00 p.m. on Friday until 6:00 p.m. on Sunday. On 20 February 2013, the trial court entered another interim order as a result of the same hearing. The 20 February order included more detailed findings of fact, conclusions of law, and decretal provisions than the 18 January 2013 order but ultimately granted the same visitation.
 

 On 13 February 2013, Mother filed a motion for psychological and mental health evaluation, to appoint an expert pursuant to Rule 706, and to appoint a Guardian ad Litem ("GAL") for the child. Mother alleged that Father had been diagnosed with bipolar disorder and depression, that he was not taking medications as prescribed, and that he had "extreme mood swings" from being "gregarious and outgoing" to "openly belligerent and hostile." She alleged that Father was mentally unstable and unable to care for the child.
 

 On 11 March and 22 April 2013, the trial court held a hearing on temporary custody, temporary child support, Mother's motion for psychological evaluation and appointment of GAL, and attorney fees. The court entered its order from this hearing on 25 June 2013. The order continued
 Mother's alternate weekend visitation, set out a detailed visitation for various holidays, and granted Mother three weeks of summer visitation, but did not allow Mother to remove Timothy from North Carolina. The order set temporary child support, requiring Mother to pay $574.85 per month, beginning 1 June 2013. The order also denied the remaining motions for psychological evaluation, appointment of GAL, and attorney fees.
 

 Over seven days, beginning on 10 February 2014 and ending on 1 August 2014, the trial court heard the matters of permanent custody, permanent child support, attorney fees, and contempt.
 
 [3]
 
 The trial court entered
 its order on these issues on 5 December 2014. Mother filed her notice of appeal from this order on 2 January 2015.
 

 Although we will address the details of the order on appeal below, for purposes of addressing the procedural posture and finality of the 5 December 2014 order, we note that the order included the following requirements, which Mother also challenges on appeal:
 

 6. Periodic Reviews shall be conducted on the following schedule and for the following purposes:
 

 a. Review One: Shall be conducted within 30 days of the entry of this order, the specific date is yet to be determined, the purpose of which shall be to determine whether therapy for mother, as ordered herein, has begun.
 

 b. Review Two: Shall be conducted within 60 days of the entry of this order, the specific date is yet to be determined, the purpose of which shall be to determine Mother's progress in therapy and to obtain an initial report from the Mother's therapist regarding her rehabilitation in acknowledging that Father has not physically abused the minor child, has not engaged in substance abuse and to access [sic] her progress in taking responsibility for the damage and anxiety that she has caused in the minor child.
 

 c. Review Three: Shall be conducted within 90 days of the entry of this Order, the specific date is yet to be determined, the purpose of which shall be to determine Mother's progress in therapy and to obtain a report from the Mother's therapist regarding her rehabilitation in acknowledging that Father has not physically abused the minor child, has not engaged in substance abuse and to access [sic] her progress in taking responsibility for the damage and anxiety that she has caused in the minor child. All of this will be taken into account to determine at this final review whether to further restrict or expand visitation.
 

 On 9 February 2015, the trial court held the 30 day review hearing, as required by the 5 December order, to review Mother's progress in therapy and compliance with the order. The trial court found that Mother had "failed to produce evidence that she obtained a mental health evaluation from a licensed psychologist" and that she had only consulted with a "Dr. Sydney Langston" but had not produced evidence of Dr. Langston's credentials. The order noted that Mother continued to be under the requirements of the 5 December order and that she would have to appear for the 60 day and 90 day review hearings.
 

 On 9 April 2015, this Court issued an order granting Mother's petition for writ of supersedeas and motion for temporary stay, providing in pertinent part:
 

 The petition for writ of supersedeas is allowed, and the 5 December 2014 order of Judge Joseph Williams is stayed insofar as it directs defendant and her child to submit to a mental health assessment and achieve certain goals through therapy and as it requires periodic review hearings to determine whether defendant has attained those goals. Therefor, [sic] decrees four and six of the trial court's order are hereby stayed pending the resolution of defendant's appeal from Judge Williams' order.
 

 II. Interlocutory appeal
 

 Mother acknowledges that the 5 December order is interlocutory because her counterclaim for equitable distribution is still pending.
 
 [4]
 

 However, she argues that her appeal is timely under N.C. Gen. Stat. § 7A-27(b)(3)(e) (2015), and more specifically,
 
 N.C. Gen. Stat. § 50-19.1
 
 (2015)
 

 , which provides that "[n]otwithstanding any other pending claims filed in the same action, a party may appeal from an order or judgment adjudicating a claim for ... child custody [or] child support ... if the order or judgment would otherwise be a final order or judgment within the meaning of G.S. 1A-1, Rule 54(b), but for the other pending claims in the same action."
 
 N.C. Gen. Stat. § 50-19.1
 
 .
 

 Mother is correct that this order may be immediately appealable, since it adjudicates claims for custody and child support, even if equitable distribution remains unresolved. Yet she fails to address whether the order on appeal "would
 
 otherwise
 
 be a final order or judgment within the meaning of G.S. 1A-1, Rule 54(b) [.]"
 
 N.C. Gen. Stat. § 50-19.1
 
 (emphasis added). The order, by its own terms, was not final as to Mother's visitation and set hearings to be held in 30, 60 and 90 days to address this issue after her mental health evaluation. We note that this Court has held similar orders, which set follow-up or review hearings to address issues of pending therapy or psychological evaluations, to be temporary, even though the order was entitled as a "permanent" custody order.
 
 See
 

 Smith v. Barbour
 
 ,
 
 195 N.C.App. 244
 
 , 249,
 
 671 S.E.2d 578
 
 , 582 (2009) ("Although the 20 April 2005 order was entitled 'Permanent Custody' order, the trial court's designation of an order as 'temporary' or 'permanent' is not binding on an appellate court. Instead, whether an order is temporary or permanent in nature is a question of law, reviewed on appeal de novo. As this Court has previously held, an order is temporary if either (1) it is entered without prejudice to either party; (2) it states a clear and specific reconvening time in the order and the time interval between the two hearings was reasonably brief; or (3) the order does not determine all the issues. In this case, the 20 April 2005 order meets both the second and third prongs of the test. There is no dispute that the trial court did not determine all of the issues before it since it did not decide Ms. Barbour's right to visitation. The order expressly stated that the 'issue of visitation' would be set for hearing only after the ordered psychological evaluations had been completed and specified that the trial court 'retain[ed] jurisdiction to determine the frequency and conditions under which the Defendant and her parents may visit with the minor child. ...' The order provided for a hearing on 'this issue of visitation to be scheduled not later than July 15, 2005.' This date qualifies as a clear and specific reconvening time after a time interval that was reasonably brief." (citations, quotation marks, and brackets omitted)).
 

 It seems that the order on appeal is quite similar to the order in
 
 Smith
 
 , since it provided for additional hearings, at "clear and specific reconvening time[s]" and did not address all of the issues,
 

 id.
 

 just as in this case, where the trial court needed additional hearings to consider Mother's mental health evaluation and its effect upon her visitation. Here, however, another panel of this Court has previously ordered the relevant provisions of the 5 December 2014 order stayed, pending this appeal. As we are bound by that ruling, we will address Mother's appeal.
 
 See, e.g.
 
 ,
 
 In re Civil Penalty
 
 ,
 
 324 N.C. 373
 
 , 384,
 
 379 S.E.2d 30
 
 , 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). In addition, if we were to dismiss Mother's appeal, it would only add to the delay in establishing a final custodial schedule, much to Timothy's detriment.
 

 III. Discussion
 

 On appeal, Mother raises multiple issues with the trial court's order in relation to custody, child support, civil contempt, and attorney fees. We address the issues raised regarding each in separate sections below.
 

 A. Custody
 

 Mother raises at least six issues on appeal regarding the custody portion of the order, and we will address the second and third issues first, since they challenge the adequacy of the trial court's findings of fact and evidentiary support for the findings. If the trial court's findings are inadequate or not supported by evidence, they cannot support its conclusions of law, and the order would fail for that reason alone.
 

 1. Recitations of testimony
 

 Mother identifies 17 findings of fact, out of the 209 findings made by the trial court, which she argues are entirely or partly recitations of testimony which do not resolve the disputes raised by the conflicting evidence presented. She also argues that the order is "written in an unwieldly, haphazard style," citing to
 
 Peltzer v. Peltzer
 
 ,
 
 222 N.C.App. 784
 
 , 789,
 
 732 S.E.2d 357
 
 , 361 (2012), in which we noted that an order was "written in a style perhaps best described as stream of consciousness." Here, Mother notes the repeated use of the words "testified," "indicated," "told," "asserts," and "believes" in those findings.
 

 We first address Mother's argument regarding the "haphazard" style of the order. This order is nothing like the equitable distribution order in
 
 Peltzer
 
 , in which findings were all mixed together and did not
 "address the identification, classification, and valuation of the property and the distributional factors in any logical or organized manner[.]"
 

 Id.
 

 In this order, by contrast, the findings of fact are set out in separate sections entitled as follows: "Parties, Jurisdiction and Background"; "Arkansas Issues"; "DSS Involvement"; "School"; "Child Support (Permanent Support, Contempt and Motion to Reduce)"; "Difficulty in Mother Returning the Child"; "Miscellaneous"; "Attorney Fees"; and "Arrangements at Time of Hearing." Furthermore, in
 
 Peltzer
 
 , despite the haphazard style, we searched through the order and found that the trial court had made all of the findings required by the issues in the case and ultimately affirmed the majority of the order, other than remanding "for clarification of one of the trial court's findings of fact[.]".
 
 Id.
 
 at 798,
 
 732 S.E.2d at 367
 
 . We do not require that orders have any particular style or organization, although a well-organized order is easier for everyone to understand. In any event, this order is reasonably well-organized. Thus, we reject this portion of Mother's argument.
 

 We also reject Mother's argument that the trial court's findings are merely recitations of evidence. She is correct that some of the findings recite portions of testimony of various witnesses and that the order uses the words noted above. In the interest of brevity, we will not quote large portions of the nineteen-and-a-half page, single-spaced, small-font order. Moreover, we note that Mother does not challenge the vast majority of the 209 findings.
 

 Most of Mother's objections are from the portion of the order dealing with "DSS Involvement." The order does recite some of the testimony from social workers who interviewed Timothy and the parties regarding various reports of abuse. Since there were four DSS investigations during the course of the case, this evidence was extensive. The transcript of the entire trial comprises more than 1400 pages, and the Rule 9(d) supplement including exhibits from trial has 889 pages. To summarize very briefly, the order makes many findings which indicate repeated, persistent efforts by Mother to obtain custody of Timothy by accusing Father of being physically abusive, mentally unstable, and a "druggie." Therapists and social workers have had concerns that Mother was "coaching" Timothy to report abuse or bad behavior by Father. Although the findings of fact are certainly not entirely favorable to Father either, overall the trial court entirely rejected Mother's claims of child abuse, drug abuse, or uncontrolled mental illness. The trial court also very definitely resolved any conflicts in the evidence and determined that Mother was intentionally trying to alienate Timothy from Father. For example, the following findings are not challenged by Mother, at least as recitations of testimony:
 

 178. Ms. Lueallen called Charlotte Mecklenburg Schools about two children being left unattended at Mr. Lueallen's football practice.
 

 179. On April 20th, Ms. Lueallen texted Mr. Lueallen, "are you going to kill yourself and [Timothy] when you lose in court like you promised?" On December 24, Ms. Lueallen texted Mr. Lueallen, "maybe you are like Anakin Skywalker, are you at least a [sic] good a father as Vader?"
 

 180. Ms. Lueallen paid a private investigator to go through Mr. Lueallen's
 trash, and paid for two drug tests on Mr. Lueallen.
 

 181. Defendant Mother's efforts to destroy the Plaintiff Father and re-obtain custody have been persistent and on-going since September of 2013 and the child has demonstrated deterioration psychologically as a result.
 

 182. Ms. Lueallen has incurred $70,000.00 to $80,000.00 in attorney's fees, including the Arkansas lawyer, private investigator and two North Carolina lawyers and has paid the lawyers $10,000.00 to $20,000.00.
 

 183. Further, Mother's advancement of false claims of abuse have necessarily increased the costs of litigation, the number of witnesses necessary for trial to defend such accusations and the length of the trial as well.
 

 184. The Court finds as a conclusion of law that the Defendant Mother has acted in bad faith.
 

 ....
 

 209. The Plaintiff Father has not physically abused the minor child.
 

 The trial court also includes under "Conclusions of Law" in the order what are probably better characterized as ultimate findings of fact:
 

 11. Plaintiff Father has never physically abused the minor child.
 

 12. Defendant Mother's false belief that Plaintiff physically abused the child, and her baseless and false
 belief that Plaintiff Father is a "druggie" and an "alcoholic" has created an environment of investigation, physical, psychological and emotional that has created anxiety in the child and has not been in the child's best interest.
 

 Overall, the findings of fact are not simply recitations of testimony, and they definitively find ultimate facts " 'sufficient for the appellate court to determine that the judgment [was] adequately supported by competent evidence.' "
 
 In re Anderson
 
 ,
 
 151 N.C.App. 94
 
 , 97,
 
 564 S.E.2d 599
 
 , 602 (2002) (quoting
 
 Montgomery v. Montgomery
 
 ,
 
 32 N.C.App. 154
 
 , 156-57,
 
 231 S.E.2d 26
 
 , 28 (1977) ). In addition, the findings " 'reflect a conscious choice between the conflicting versions of the incident[s] in question which emerged from all the evidence presented.' "
 
 Moore v. Moore
 
 ,
 
 160 N.C.App. 569
 
 , 571-72,
 
 587 S.E.2d 74
 
 , 75 (2003) (quoting
 
 In re Green
 
 ,
 
 67 N.C.App. 501
 
 , 505 n. 1,
 
 313 S.E.2d 193
 
 , 195 n. 1 (1984) ). Mother's argument is without merit.
 

 2. Evidentiary Support for Findings
 

 Mother also argues that "many findings lack competent evidentiary support." Mother identifies several findings which she claims are unsupported. First, she argues that "no competent evidence" supports Finding of Fact No. 181, which was as follows:
 

 181. Defendant Mother's efforts to destroy the Plaintiff Father and re-obtain custody have been persistent and on-going since September of 2013 and the child has demonstrated deterioration psychologically as a result.
 

 Her argument consists of noting portions of the testimony that are favorable to her and her interpretations of the evidence. She makes the same argument regarding Finding of Fact No. 183, and we reject it for the same reasons. Although there was conflicting evidence on many facts, as noted above, the trial court rejected Mother's interpretations of the evidence. The trial court evaluated the credibility and weight of the evidence and made findings accordingly.
 

 [A]s is true in most child custody cases, the determination of the evidence is based largely on an evaluation of the credibility of each parent. Credibility of the witnesses is for the trial judge to determine, and findings based on competent evidence are conclusive on appeal, even if there is evidence to the contrary. Here, each parent testified to his
 or her version of the events which led to the above crucial findings of fact. The fact that the trial judge believed one party's testimony over that of the other and made findings in accordance with that testimony does not provide a basis for reversal in this Court. The findings are based largely on defendant's competent, and apparently credible, testimony and are thus binding on this Court.
 

 Woncik v. Woncik
 
 ,
 
 82 N.C.App. 244
 
 , 248,
 
 346 S.E.2d 277
 
 , 279 (1986)
 

 (citations omitted).
 

 Her other objections are mainly arguments that certain findings misstated evidence in minor ways. For example, she notes that in Finding of Fact No. 180, the trial court found that
 
 she paid f
 
 or two drug tests of Father, but the evidence shows that she paid for only one and that DSS paid for the other. There is no dispute that he had two drug tests, both negative, and both inspired by Mother's claims that he was abusing drugs. Who paid for one of the tests is not dispositive. And even if she is correct and we were to ignore this particular finding, the remaining 208 findings would fully support the trial court's order. Her other arguments as to a few other findings are similar, noting minor misstatements in portions of findings or her favorable interpretations of various bits of evidence. We find that all of the findings of fact regarding custody were more than adequately supported by the evidence.
 

 3. Decree Provisions 4 and 6
 

 Now that we have established that the findings of fact are sufficient, we will address Mother's first argument regarding custody, which is that "Decrees four and six of the custody decision contravene established precedent." She argues that Decree 4 "subjects [Mother] to a mandatory mental health evaluation/therapy process, the goal of which is to force her to believe the trial court's determinations that [Father] never abused substances or [Timothy.]" She also notes that the decree "commands [Timothy's] therapist to 'wholeheartedly' accept such determinations as true and thereby assess,
 
 inter alia
 
 , '[w]hat effect, if any the continued contact or exposure to [Mother], especially her belief that [Father] abused the child and abused substances, has had on [Timothy.]"
 

 Mother cites
 
 Peters v. Pennington
 
 ,
 
 210 N.C.App. 1
 
 ,
 
 707 S.E.2d 724
 
 (2011) in support of her argument, noting that in
 
 Peters
 
 , this Court "vacated a decree equivalent to Decrees 4 and 6." The
 
 Peters
 
 case is factually somewhat similar to this one, in that after cooperating with each other regarding joint custody for approximately two years, the mother and father engaged in an extended, extremely contentious custody
 dispute.
 
 Id.
 
 at 4-5,
 
 707 S.E.2d at 729
 
 . The mother accused the father of sexually abusing the children and continued to insist that the children were being sexually abused even after investigations by law enforcement and DSS and an evaluation by a private therapist found the accusations to be unfounded.
 
 Id
 
 . at 5-7,
 
 707 S.E.2d at 729-30
 
 . After a three-week trial, with over 24 witnesses, "including the parties, relatives and friends, school officials, law enforcement officers, DSS personnel, the boys' former and current therapists, and several expert witnesses[,]" the trial court's order addressed the "two central issues: (1) whether [the father] abused his sons and (2) whether [the mother's] actions in connection with her allegations of abuse were abusive and caused damage to the children."
 
 Id
 
 . at 7-8,
 
 707 S.E.2d at 730
 
 . The trial court definitively found that the father had not sexually abused the children and that the mother's continued insistence that he had and her actions based upon this belief were abusive and had damaged the children.
 
 Id
 
 . at 8,
 
 707 S.E.2d at 731
 
 .
 

 The relevant portion of the order challenged in
 
 Peters
 
 was as follows:
 

 5. Defendant/Mother shall obtain mental health treatment by a provider who shall read this Order in full, shall commit to wholeheartedly accepting that the findings contained herein constitute the reality of Frank and Dennis's lives and Defendant/Mother's role in fabricating sex abuse allegations, even though she may have genuine belief that such events occurred, and shall work towards Defendant/Mother's rehabilitation in acknowledging that Plaintiff/Father has not sexually abused the minor children and in taking responsibility for the damage she has caused to her sons. Defendant/Mother's therapy may include any other areas that the provider identifies.
 

 ....
 

 7. The minor children shall continue in therapy with Dr. Curran and Ms. Duncan, who shall read this order in its entirety and commit to accepting it wholeheartedly as the facts constituting the false allegations of sexual abuse with respect to Frank and Dennis. Dr. Curran and Ms. Duncan
 shall determine what type of therapy the minor children need in light of these findings.
 

 Id.
 
 at 9-10,
 
 707 S.E.2d at 731
 
 .
 

 The order in
 
 Peters
 
 also provided for future review of the mother's visitation based upon consideration of her progress in therapy and
 compliance with the court's order.
 
 Id
 
 . at 10,
 
 707 S.E.2d at 732
 
 . This Court concluded:
 

 [T]he trial court abused its discretion when fashioning [mother's] therapy. [Mother] is required by the 6 March 2009 order to acknowledge that [father] did not sexually abuse their children and accept as true the trial court's conclusion that she harmed her children. Thus, [mother] must force herself to believe that she implanted false images of sexual abuse in her children. Presumably, she must prove to a medical professional or counselor that she genuinely believes the trial court findings were correct before being certified as rehabilitated, which may be a prerequisite to obtaining significant visitation or any level of custody in the future. We hold this is an unwarranted imposition under these facts. Our objection to this requirement is that it mandates [mother] and the therapist attain a standard based upon [mother's] beliefs rather than her behavior. It would have been appropriate to require [mother] to demonstrate to the court that she would not engage in any behavior that suggests to the children that they were sexually abused. We believe this is best achieved through non-disparagement requirements and prohibitions on discussing these matters with the children, which are enforceable through the contempt powers of the trial court, including incarceration. It was an abuse of discretion to require [mother] to change her beliefs and prove to a counselor that such a change has in fact occurred. We therefore vacate paragraph 5 of the decretal portion of the 6 March 2009 order ("Decree 5") and remand the order to the trial court to enter a new order based upon [mother's] and her agents' ability to comply with existing court orders and demonstrate behavior that prevents harm to her children.
 

 Id.
 
 at 21,
 
 707 S.E.2d at 738-39
 
 .
 

 The similarity of the provisions of this order and those in
 
 Peters
 
 is perhaps no coincidence. Father's counsel asked the trial court in the closing argument to "look at these cases and to seriously consider restricting Ms. Lueallen's access to supervised therapeutic settings," and then specifically identified
 
 Peters
 
 as a similar case factually, such that similar restrictions and therapy requirements should be imposed. Unfortunately, the trial court's order relied a bit too heavily upon
 the wording of the challenged decrees from
 
 Peters
 
 . We agree that the provisions of Decrees 4 and 6 are substantially the same as the decree provisions vacated in
 
 Peters
 
 , and thus we must also vacate these provisions of the order. But this Court's additional observations in
 
 Peters
 
 also apply to this case:
 

 However, we note that [mother's] conduct placed the trial court in a difficult position. The court specifically ordered the parties not to disparage one another or to discuss the case with the children. It found, based on competent evidence, that [mother] willfully ignored these rulings, which were designed to protect the integrity of the judicial process and to protect the children from harm. The trial court likely concluded non-disparagement requirements and other tools would have been of little future value as a restraint on [mother.] The court's skepticism was justified, not only by [mother's] actions in taking the children to therapy with Dr. Tanis before a guardian
 
 ad litem
 
 was appointed, but also by her affidavits in which she documented her conversations with the children about the specific topics the court had restrained her from discussing with the children.
 

 Nevertheless, we hold it was error to require [mother] prove to her therapists that her beliefs about the factual underpinnings of the case had changed. While the trial court properly vested authority in medical professionals to determine when supervised visitation was appropriate, the court went too far in dictating the specifics of the therapists' work. [Mother's] actual behavior-and not her subjective beliefs
 over what occurred in the case-should have been the critical focus for evaluating when visitation was appropriate.
 

 Id.
 
 at 22,
 
 707 S.E.2d at 738-39
 
 .
 

 Mother is correct that the trial court cannot order her to "believe" that Father is not physically abusive and that he does not abuse drugs. Yet what a trial court can, and must, do is make findings of fact regarding events which happened in the past and order parties to take certain actions based upon those facts. In nearly every disputed case, one party claims that an event happened, and the other party claims that the event either did not happen or happened differently than claimed by the other party. The trial court must determine which of the competing versions
 of the past event is correct, and based upon that determination must order the appropriate action. In a certain sense, every court order requires all of the parties to the case to accept a particular version of the past events, at least to the extent that the parties must
 
 act
 
 in accord with the order or suffer consequences of contempt or other penalty.
 

 On remand, the trial court shall "reform the therapeutic requirements placed on [Mother] in accordance with this opinion."
 
 Id.
 
 at 29,
 
 707 S.E.2d at 743
 
 . The trial court's order may not require Mother or a therapist to "wholeheartedly accept" or believe anything and cannot evaluate Mother's progress by her beliefs, but it can require them to conform their behavior and speech when dealing with Timothy fully in accord with the trial court's findings and conclusions. The trial court properly ordered Mother to have a "mental health evaluation from a licensed psychologist" to assess any need for additional therapy. In addition, the trial court ordered that Timothy continue with his current therapist and that Mother read the order and "commit to accepting it wholeheartedly as the facts constituting the false allegations of physical and substance abuse with respect to the minor child[.]"
 

 On remand, the trial court may again order a mental health evaluation of Mother and continuing therapy for Timothy, without the offending language identified in
 
 Peters
 
 . As a practical matter, we would note that any mental health evaluation of Mother will be useless to the trial court if Mother simply repeats her allegations again to the psychologist and the psychologist accepts Mother's claims as true. In fact, if the psychologist accepts Mother's claims as true, the psychologist will be bound by law to make yet another report to DSS of Father's alleged abuse, since a report is
 
 required
 
 by N.C. Gen. Stat. § 7B-301(a) (2015). Mother even acknowledged that she was aware of this legal duty to report any allegations of abuse based upon her training as a teacher. And testimony of Timothy's therapist, Kristin Montanino, reveals that several of the DSS investigations began based upon reports which the therapist made because of what she heard from either Timothy or Mother.
 

 Additional reports of allegations of abuse based upon the same things would simply perpetuate the cycle of DSS investigations needlessly, to Timothy's detriment. The trial court in
 
 Peters
 
 was attempting to end a similar cycle of investigations of repeated, unfounded allegations of sexual abuse. If Timothy's therapist were to accept Mother's version of the facts, she would also be legally bound to make additional reports to DSS and to conduct therapy accordingly, which would likely only add to the harm to Timothy. Thus, it is entirely appropriate for the trial court to require an evaluator or therapist for either party or the child to
 
 read
 
 the court's orders so that they will be aware of the background in which the evaluation or therapy has been ordered, and they will be able to make an informed professional judgment about whether there is any need for a new report of abuse to DSS
 
 [5]
 
 . It is also appropriate for the trial court to order that a particular therapist who is conducting therapy based upon Mother's version of the facts instead of those
 established by the trial court to cease treating the child, to avoid further confusion and harm. And although Mother may continue to believe anything she likes, the trial court can take into account Mother's continued insistence on her version of the facts and the futility of any evaluations or therapy based upon her version of the facts, which unfortunately could result in a visitation order that restricts Mother's visitation even more.
 

 4. Abuse of Discretion in Custody Order
 

 Mother argues that the "custody decision manifests an abuse of discretion" mainly because "the trial court stripped [Mother] of all legal custody-and nearly all physical custody-of [Timothy] based solely on her beliefs about [Father's] conduct."
 

 "A trial judge's decision will not be upset in the absence of a clear abuse of discretion if the findings are supported by competent evidence."
 
 Phillips v. Choplin
 
 ,
 
 65 N.C.App. 506
 
 , 511,
 
 309 S.E.2d 716
 
 , 720 (1983). Furthermore,
 

 A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason. A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.
 

 White v. White
 
 ,
 
 312 N.C. 770
 
 , 777,
 
 324 S.E.2d 829
 
 , 833 (1985) (citation omitted).
 

 As we have determined above, the trial court's findings of fact were supported by the evidence. Mother also argues very briefly-just three sentences, with one cite to
 
 Peters
 
 -that the findings of fact do not support the trial court's conclusion that it is in Timothy's "best interest for
 [Father] to have sole legal custody" and "primary physical custody." Mother points out evidence favorable to her, and the trial court made findings regarding much of this evidence. She did travel from Arkansas to visit many times and consistently ate lunch with Timothy at school. The trial court found that Timothy "seemed to enjoy" these lunch visits-although the trial court also noted that she "sometimes violated the seating policy" but would move when asked. The trial court also noted that "[i]t was unusual that on about fifty (50) percent of occasions [Timothy] sat on his mother's lap."
 

 Mother's argument also notes that Father "frequently holds long hours as a football coach" and notes other evidence negative to him. Again, we will not quote large portions of the 209 findings of fact, but the findings do support the trial court's conclusion. Mother's argument asks us to re-weigh the voluminous evidence and to draw inferences in her favor instead of Father's, but that is the trial court's role, not ours. The order includes extensive findings regarding the strengths and weaknesses of both parties as parents and regarding the effects of the protracted bickering and strife and repeated investigations of alleged abuse on Timothy. The trial court did address Mother's beliefs about Father but based its order on her actions-which are most likely motivated by her beliefs, as are most of any person's actions-that "created an environment of investigation, physical, psychological and emotional that has created anxiety in the child and has not been in the child's best interest." The trial court, in its discretion, weighed all of the evidence and determined that Father is a "fit and proper person to have primary physical custody" and "sole legal custody" of Timothy and that this arrangement would be in his best interest. We cannot discern any abuse of discretion in the trial court's ruling.
 

 B. Child support
 

 Mother's next arguments address the child support order. Mother first argues that "the trial court wrongfully imputed income to [Mother.]" The trial court ordered Mother to pay $616.68 per month as permanent child support, based upon Worksheet A of the North Carolina Child Support Guidelines. As Mother argues, the trial court "seemingly imputed income to her in the annual amount of $47,000.00," since she was unemployed at the time of trial. Mother also notes that the record does not include a child support worksheet which shows the child support calculation, and from the findings in the order, it is unclear exactly how the trial court calculated the obligation.
 

 Before we address the argument as to imputation of income, we note that we also
 have been unable to determine exactly what numbers
 the trial court used to set the child support obligation. As this Court has previously noted, "[t]he better practice is for an appellant to include the Guidelines worksheet in the record on appeal."
 
 Hodges v. Hodges
 
 ,
 
 147 N.C.App. 478
 
 , 483 n.1,
 
 556 S.E.2d 7
 
 , 10 n.1 (2001). We do not know whether Mother or the trial court is responsible for the missing worksheet, since we have no brief from Father; but in any event, we cannot review the calculation without sufficient information. The trial court's findings of fact regarding the numbers needed to set child support were as follows:
 

 ?
 

 [
 
 Editor's Note:
 
 The preceding image contains the references for footnotes
 
 [6]
 

 ,
 

 [7]
 
 ]
 

 The findings of fact are supported by the evidence, but when we calculate child support using these numbers in Worksheet A based upon the Child Support Guidelines in effect at the time of the trial, we do not get a child support obligation for Mother of $616.68 or any number close enough that we can trust our calculation to be the same as the trial
 court's, whether we use the greater or lesser income for Father from the findings of fact. We are therefore unable to review the trial court's calculation of child support and must remand for the trial court to re-calculate child support and to set out the values used in the calculation. The trial court should also attach Worksheet A to any order regarding child support issued on remand.
 

 1. Imputed Income
 

 We now return to the question of whether the trial court erred by imputing income to Mother. Even if the exact numbers used in the child support calculation are uncertain, the trial court did clearly impute income to Mother, since she was unemployed and had no income at the time of trial.
 

 The North Carolina Child Support Guidelines state:
 

 If either parent is voluntarily unemployed or underemployed to the extent that the parent cannot provide a minimum level of support for himself or herself and his or her children when he or she is physically and mentally capable of doing so, and the court finds that the parent's voluntary unemployment or underemployment is the result of a parent's bad faith or deliberate suppression
 of income to avoid or minimize his or her child support obligation, child support may be calculated based on the parent's potential, rather than actual, income.
 

 The primary issue is whether a party is motivated by a desire to avoid his reasonable support obligations. To apply the earnings capacity rule, the trial court must have sufficient evidence of the proscribed intent. The earnings capacity rule can be applied if the evidence presented shows that a party has disregarded its parental obligations by:
 

 (1) failing to exercise his reasonable capacity to earn, (2) deliberately avoiding his family's financial responsibilities, (3) acting in deliberate disregard for his support obligations, (4) refusing to seek or to accept gainful employment, (5) willfully refusing to secure or take a job, (6) deliberately not applying himself to his business, (7) intentionally depressing his income to an artificial low, or
 (8) intentionally leaving his employment to go into another business.
 

 The situations enumerated ... are specific types of bad faith that justify the trial court's use of imputed income or the earnings capacity rule.
 

 Mason v. Erwin
 
 ,
 
 157 N.C.App. 284
 
 , 288-89,
 
 579 S.E.2d 120
 
 , 123 (2003) (citations and quotation marks omitted).
 

 Mother argues that the trial court's imputation of income "rests entirely upon the finding that she last applied for a job in Mecklenburg County three years' prior." Mother also notes evidence that she "persistently pursued employment after her substitute teaching job" ended in May 2013 and that she had some brief periods of temporary employment. Mother is correct that there was evidence of her efforts to obtain a new job, but the evidence also supports the trial court's determination that she was acting in disregard of her child support obligation. The determination was based only in part on the fact that Mother had not applied for a job in Mecklenburg County in the past three years.
 

 The trial court identified other factors as well. And the trial court may have considered her failure to apply for jobs in Mecklenburg County particularly telling, since she alleged in her verified motion to modify child support, filed on 3 July 2013, that she was "
 
 currently actively seeking employment
 
 as a teacher in both the elementary and middle school levels
 
 in both Union County and Southern Mecklenburg County
 
 ." (Emphasis added). At trial over a year after she filed this verified motion, she had actually
 
 not
 
 sought employment in Mecklenburg County in "three years" as found by the trial court-contrary to her motion. In addition, there was extensive testimony at trial regarding Mother's educational and professional qualifications and her work history. It was not unreasonable to expect her to seek employment in Mecklenburg County, based on her own verified statement that she was actually doing so. In addition, she had taught in the Mecklenburg County schools in the past, before taking her more recent teaching job in Union County which she resigned prior to her move to Arkansas.
 

 Here, the order also notes at least two of the factors identified by
 
 Mason
 
 which can support the trial court's conclusion that Mother acted in bad faith and intentionally suppressed her income and imputation of income. One factor is that a parent " 'intentionally leav[es] his employment to go into another business' "
 
 Id.
 
 at 289,
 
 579 S.E.2d at 123
 
 (quoting
 
 Wolf v. Wolf
 
 ,
 
 151 N.C.App. 523
 
 , 527,
 
 566 S.E.2d 516
 
 , 519 (2002) ). Here, the trial court found that Mother "resigned her employment with Union
 County Schools ... effective June 21, 2012." She quit this job "without having another job lined up." She also left her job in Arkansas to move back to North Carolina. She did get a job after that, but it was temporary, and she had minimal income from a brief "customer service job" and as a substitute teacher. In addition, the trial court considered that Mother was " 'refusing to seek or to accept gainful employment.' "
 

 Id.
 

 (quoting
 
 Wolf
 
 , 151 N.C.App. at 527,
 
 566 S.E.2d at
 
 519 ). The trial court made the following findings of fact and related conclusion of law:
 

 106. Ms. Lueallen has interviewed for jobs and anticipates if hired in a teaching position she would earn $47,000.00 per year.
 

 ....
 

 115. Ms. Lueallen last applied for a job at Charlotte Mecklenburg Schools three (3) years ago.
 

 ....
 

 117. The Defendant Mother has had the means and ability to comply with the prior orders of the court, has failed to look for a job in the largest county neighboring the county of residence of the Defendant Mother and the court finds that she has failed to exert the necessary effort to obtain employment and the court finds that she has willfully suppressed her income to avoid her child support obligation.
 

 ....
 

 Conclusions of Law:
 

 ....
 

 8. The Defendant Mother has had the means and ability to comply with the prior orders of the court, has failed to look for a job in the largest county neighboring the county of residence of the Defendant Mother and the court finds that she has failed to exert the necessary effort to obtain employment and the court finds that she has willfully suppressed her income to avoid her child support obligation.
 

 As noted by
 
 Mason
 
 , "[t]he primary issue is whether a party is motivated by a desire to avoid his reasonable support obligations."
 

 Id.
 

 (quotation marks omitted). The trial court made several findings about
 Mother's failure to pay any child support at all during some time periods when she did receive income or unemployment compensation. The trial court also found that Mother had "regularly eaten at fast food restaurants" during some months when she paid no child support.
 

 Mother could have paid some amount of child support during these months, even if far less than required by the temporary child support order, but she chose to pay nothing, which is relevant to determining her motivation and bad faith. The trial court found further that Mother "has incurred $70,000.00 to $80,000.00 in attorney's fees, including the Arkansas lawyer, private investigator, and two North Carolina lawyers and has paid the lawyers $10,000.00 to $20,000.00." In fact, Mother testified that she had paid $10,000.00 to $20,000.00 of the fees, totaling up to $80,000.00; her mother had paid "in the ballpark" of $50,000.00 to $60,000.00, but she had not obtained any financial assistance from anyone to pay any child support. The trial court may well have doubted Mother's motivations when she paid up to $20,000.00 in attorney fees and obtained assistance to pay up to $80,000.00, during a time when she went many months without paying even one dollar toward her child support obligation.
 

 The trial court also made findings which more directly address Mother's motivations:
 

 100. Ms. Lueallen has told Mr. Lueallen, "I am a mom and moms don't pay child support."
 

 101. In regards to Ms. Lueallen reducing her child support, she has stated, "I've not got unemployment since December so child support should be $50.00 per month.["]
 

 ....
 

 207. In the past, when [Timothy] has been placed in the custody and care of Ms. Lueallen she has demanded that Mr. Lueallen pay babysitting fees.
 

 The trial court also concluded, in regard to bad faith:
 

 14. The Court finds as a conclusion of law that the Defendant Mother has acted in bad faith.
 

 The findings support the trial court's conclusions that Mother was willfully suppressing her income to avoid her child support obligation and that she was acting in bad faith. The trial court properly imputed income to Mother. On remand, when recalculating child support as
 noted above, the trial court should use the imputed income, which we believe to be $47,000.00 annually, but the trial court should make the actual amount used clear in its findings and calculations.
 

 2. Amount of Child Support Arrearage
 

 Mother next argues that "the findings of fact do not support the arrearage decree." The trial court set the total child support arrearages at $7,314.43, and this
 number includes $616.68 which "came due on November 1, 2014." We also note that the trial ended on 1 August 2014. It is impossible for the trial court's determination as to arrears accrued
 
 after
 
 the trial ended to be based upon the evidence presented
 
 at
 
 trial, nor could it be supported by the record on appeal. On remand, the order may address any arrears accrued up to the last day of trial, based on the evidence presented at trial. We also realize that there may have been communications between counsel and the trial court regarding the November child support payment and an agreement to include this month to avoid the expense of an additional hearing or order. Unfortunately, our record does not reflect any such agreement, and we have no brief from Father, so the trial court can correct this calculation on remand.
 

 Mother also argues that five of the factual findings of amounts of child support owed and paid in various months do not add up to the amount ordered as arrears, and the months after April 2014 seem to have been omitted. We are not entirely sure if any months were omitted from the trial court's calculations, since one again, we cannot get the math to work.
 

 By our calculations, based upon the trial court's findings of fact, the arrears owed as of the last day of trial would be $6797.75, and the trial court did specifically and erroneously include at least one month after the trial ended. On remand, the trial court should clearly set forth the calculation of arrears. We would suggest that a table showing the calculation would be helpful. Purely as a practical matter, it is easier to avoid mathematical errors when the numbers can be totaled in columns instead of having to hunt for numbers paid and owed and dates scattered throughout 19 single-spaced, small-font pages of findings.
 

 C. Civil Contempt for Failure to Pay Temporary Child Support
 

 In addition to establishing permanent custody and support, the trial court also heard Father's motion to show cause for failure to comply with the order in the child support action, filed on 23 May 2014. An
 order to show cause was issued to Mother, requiring her to appear on 2 June 2014 for a hearing. The motion alleged that Mother owed arrears of $4,498.35 as of 13 May 2014. The trial court heard the motion along with the other matters during the trial.
 

 1. Failure to Pay
 

 Mother argues that "the trial court reversibly erred in holding [Mother] in civil contempt" because her failure to pay was not willful, based upon her periods of unemployment.
 

 Review in civil contempt proceedings is limited to whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law. Findings of fact made by the judge in contempt proceedings are conclusive on appeal when supported by any competent evidence and are reviewable only for the purpose of passing upon their sufficiency to warrant the judgment.
 

 However, findings of fact to which no error is assigned are presumed to be supported by competent evidence and are binding on appeal. The trial court's conclusions of law drawn from the findings of fact are reviewable de novo.
 

 Tucker v. Tucker
 
 ,
 
 197 N.C.App. 592
 
 , 594,
 
 679 S.E.2d 141
 
 , 142-43 (2009) (citations, quotation marks, and brackets omitted).
 

 Mother's primary argument regarding civil contempt is that the evidence did not support the trial court's finding that she had the ability to comply with the subject order yet willfully failed to do so. She argues that she was "unemployed for significant periods of time after her substitute teaching position at New Town Elementary School ended in May 2013" and that although she received some unemployment compensation and earnings from temporary jobs intermittently, the income did not allow her to pay her living expenses and her temporary child support obligation of $574.85. Thus, she argues that her failure to pay was not willful and that she did not have the ability to comply.
 

 The temporary child support order was entered on 25 June 2013, although it was based upon a hearing which ended on 22 April 2013. Mother was ordered to pay
 $574.85 beginning on 1 June 2013. In the temporary child support order, the trial court found that Mother was
 employed at New Town Elementary School
 
 [8]
 
 "through the rest of this year as a contract teacher filling in for a teacher who is out on maternity leave." Thus, by the time the temporary order was entered by the court, Mother's temporary job at New Town Elementary had already ended, in May 2013. On 3 July 2013, Mother filed a motion to modify child support, alleging that her job had ended so she was receiving unemployment compensation. She also alleged that she "is currently actively seeking employment as a teacher in both the elementary and middle school levels in both Union County and Southern Mecklenburg County school districts in the hopes of obtaining a job and maximizing her income potential." The order on appeal, in addition to finding her in contempt, specifically denied this motion to modify.
 

 As discussed above, we have already determined that the trial court's findings were supported by the evidence. The trial court properly concluded that Mother had "willfully suppressed her income to avoid her child support obligation." In addition, we have determined that the trial court properly imputed income to Mother and concluded that she acted in bad faith based on her failure to make reasonable efforts to obtain a new full-time position.
 

 The trial court's conclusions of law regarding Mother's willful failure to pay child support and her ability to comply are supported by the findings of fact.
 

 Our State's case law reveals a well-established line of authority which holds that a failure to pay may be willful within the meaning of the contempt statutes where a supporting spouse is unable to pay because he or she voluntarily takes on additional financial obligations or divests him or herself of assets or income after entry of the support order. A contrary rule would permit a supporting spouse to avoid his or her obligations by the simple means of expending assets as he or she pleased, and then pleading inability to pay support, thereby insulating him or herself from punishment by an order of contempt.
 

 Shippen v. Shippen
 
 ,
 
 204 N.C.App. 188
 
 , 190-91,
 
 693 S.E.2d 240
 
 , 243-44 (2010) (citations and quotation marks omitted).
 

 For these reasons, Mother's argument is without merit.
 

 2. Purge Conditions
 

 Mother next argues that the purge conditions of the order are not supported by the findings of fact and conclusions of law. The trial court ordered that Mother "shall purge herself of said contempt by payment of an additional $75.00 per month through Centralized Collections, which shall also be applied towards her arrears."
 
 [9]
 
 The order does not specify when the purge payments end.
 

 As noted above, we are remanding for the trial court to recalculate the child support obligation and child support arrears. For this reason alone, we would have to vacate this portion of the order, since the amounts may be different on remand and the trial court would need to set new purge conditions, based upon appropriate findings of fact and a conclusion of law as to Mother's ability to purge herself of contempt. As also noted above, we are not entirely certain of the income which the trial court imputed to Mother.
 

 This Court recently vacated an order which did not set any ending date for payments to purge contempt in
 
 Spears v. Spears
 
 , --- N.C.App. ----,
 
 784 S.E.2d 485
 
 (2016). In
 
 Spears
 
 , the order held the defendant in contempt and required the defendant to make purge payments of an additional $900.00 per month "over and above" the ongoing child support and alimony obligations set by the order.
 

 Id.
 

 at ----,
 
 784 S.E.2d at 488
 
 . The
 
 Spears
 
 plaintiff countered that
 

 the absence of an ending date for the monthly payment of $900.00 "over and above" the February 2013 Order's obligations indicates that this additional payment is simply a monthly payment towards the arrears of $12,770.80, which would end on a definite date when the arrears were paid in full. (Plaintiff contends that the $900.00 monthly payments would satisfy the first purge condition in "just over 14 months" since "$12,770.80 delinquency ÷ $900.00 additional payment = 14.189 months)." This is a reasonable argument, but it might be more convincing if the amount paid each month would divide evenly by a number of months. By plaintiff's logic, the order implies that defendant must pay $900.00 for fourteen months and 18.98 percent of that amount in the fifteenth month, or $170.80.
 

 Even if this was the trial court's intent, the order is impermissibly vague as written. Accordingly, we hold that the trial court erred in failing to establish a definite date by which defendant could have purged himself of the contempt. We also note that in the Order on Purge Condition Noncompliance, the trial court repeated this error when it ordered that defendant's "civil contempt shall continue unless he makes payments consistent with the February 2013 Order and the purge conditions set by this Court."
 

 Id.
 

 at ----,
 
 784 S.E.2d at 501
 
 (citations omitted).
 

 Here, as in
 
 Spears
 
 , the purge conditions are impermissibly vague. Even if the $75.00 per month is applied toward arrears, the ending date is uncertain. We vacate the purge conditions and direct that the trial court enter new conditions on remand, consistent with this opinion.
 

 D. Attorney Fees
 

 Finally, Mother argues that "the trial court reversibly erred in awarding [Father] $20,000.00 in attorneys' fees" because "the findings of fact do not support the award." The trial court's findings of fact regarding attorney fees are limited as they address only the total amounts billed by Father's counsel in North Carolina and Arkansas; Father's inability to pay all of his attorney fees and that he had to borrow money; and that he "brought this action in good faith and does not have the means and ability to defray the costs of this action, which has been greatly increased due to the false allegations made by [Mother.]"
 

 The order fails to make any findings regarding the reasonableness of the attorney fees as required by law. Although the trial court found that Father was acting in good faith and has insufficient means to defray the expense of the suit, as required by
 
 N.C. Gen. Stat. § 50-13.6
 
 , the order failed to make any findings as to " 'the nature and scope of the legal services rendered, the skill and time required, the attorney's hourly rate, and its reasonableness in comparison with that of other lawyers.' "
 
 Smith
 
 ,
 
 195 N.C.App. at 255
 
 ,
 
 671 S.E.2d at 586
 
 (quoting
 
 Cobb v. Cobb
 
 ,
 
 79 N.C.App. 592
 
 , 595,
 
 339 S.E.2d 825
 
 , 828 (1986) ). It is necessary that the record contain findings regarding these factors in order to determine whether an award for attorney fees is reasonable, and "[i]f these requirements have been satisfied, the amount of the award is within the discretion of the trial judge and will not be reversed in the absence of an abuse of discretion."
 

 Id.
 

 (quotation marks and brackets omitted).
 

 The parties offered detailed affidavits regarding attorney fees, so on remand the trial court must also make additional findings of fact addressing " 'the nature and scope of the legal services rendered, the skill and time required, the attorney's hourly rate, and its reasonableness in comparison with that of other lawyers' " in support of its award of attorney fees.
 

 Id.
 

 (quoting
 
 Cobb
 
 ,
 
 79 N.C.App. at 595
 
 ,
 
 339 S.E.2d at
 
 828 ).
 

 IV. Conclusion
 

 For the reasons stated above, we affirm the portions of the trial court's order addressing custody, with the exception of Decree provisions 4 and 6, which must be vacated and rewritten on remand. In addition, we vacate portions of the order regarding calculating child support and arrears and remand for recalculation of those amounts and so that the trial court may set out in more detail the numbers used in making those calculations. We also find that the purge conditions in the order are impermissibly vague and
 therefore must be redefined more precisely on remand. Finally, we remand for additional findings of facts regarding the award of attorney fees.
 

 On remand, since portions of the order on appeal are vacated and the trial court will be entering a new order-and must be able to make findings and conclusions as to Mother's present ability to comply with the obligations set by the order, including any purge conditions for contempt-the court shall, upon timely written request from either party, hold an additional hearing to address the order on remand. Evidence and argument presented at this hearing shall be limited to evidence necessary for the purposes as noted in this opinion.
 

 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 

 Judges ELMORE and DIETZ concur.
 

 This is a pseudonym, to protect the identity of the minor child.
 

 We note that Mother's Arkansas complaint alleged that the parties separated on 11 November 2011; her North Carolina answer alleged that the parties separated on 13 September 2011; and the 18 January 2013 visitation order found that the parties separated on 13 September. Mother testified at the 16 January 2013 hearing that they separated on "September 11 through 13th, but officially, permanently, it was in November 11th of 2011." In any event, the exact date of separation is not material for purposes of this appeal.
 

 On 23 May 2014, Father filed a motion to show cause for failure to pay child support, alleging that Mother had paid only a portion of the amount owed for some months and had paid nothing for the months of April and May 2014. The pending motion by Mother to modify the temporary child support order was also addressed.
 

 Her other pending claims for post-separation support and alimony have been dismissed voluntarily.
 

 In particular, any new therapist who is not familiar with the history of this family needs to be able to determine if some information from Mother or Timothy is related to an incident or issue already addressed by the court's order, or if something new and different has happened that may actually need to be reported. The therapist is not required to "believe" anything but does need to be fully aware of the prior allegations and the trial court's determinations regarding those allegations.
 

 Some of the confusion comes from the length of the trial, which began on 10 February 2014, during the 2013-14 school year. The trial court's Finding of Fact No. 95 found "[Father's] current income
 
 is
 
 $3590.91 per month." (Emphasis added). This was Father's income during the trial. The trial ended on 1 August 2014. Finding of Fact No. 102 states that "[Father's] salary
 
 will be
 
 $48,492.20 per year plus $2,038.30 as an assistant coach." (Emphasis added.) He was to begin a new position with the Charlotte-Mecklenburg schools as of 19 August 2014, with an annual income for the 2014-15 school year of $48,492.20. Thus, by the time of the entry of an order, Father would be receiving the greater income.
 

 In Finding of Fact No. 97, the trial court found that Father pays $35.00 per week for afterschool care. We have assumed 4.3 weeks per month, for nine months of the school year, to calculate a monthly total, but we also realize that since Father is a teacher and coach his need for after-school care may vary from the usual.
 

 One finding in the temporary order states that New Town Elementary is in Arkansas, but from the evidence and other findings we believe that this was a clerical error, as the evidence shows that New Town Elementary is in Union County, North Carolina.
 

 On top of that, the order
 
 also
 
 required Mother to pay $100.00 per month toward arrears, in addition to her ongoing child support obligation of $616.68. Thus, the order required a total monthly payment of $791.68.